Perrijean EAST, individually and as administratrix of the estate of Ray East, deceased, Plaintiff,

v.

CITY OF CHICAGO, et al., Defendants.

No. 88 C 8131.

United States District Court,
N.D. Illinois, E.D.

July 18, 1989.

James D. Montgomery, James D. Montgomery & Assoc., Ltd., Chicago, Ill., for plaintiff.

Patrick Rocks, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Perrijean East ("Perrijean") has sued the City of Chicago ("City"), City police officers Robert Skahill ("Skahill"), Kevin Rogers ("Rogers"), John Zalatoris ("Zalatoris"), Christopher Paluch ("Paluch") and Donald Washington ("Washington") and various other officers whose names Perrijean does not know. She sues both in her individual capacity and as administratrix of the estate of her deceased son, Ray East ("East"), asserting a variety of claims arising from his arrest and detention in September 1987:

1. Counts I–III claim violations of 42 U.S.C. §§ 1981, 1983, 1985 and 1986.[1]

2. Counts IV and V contain pendent claims for wrongful death and assault and battery.

All named defendants have now moved under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss the Second Amended Complaint (the "Complaint").[2] For the reasons stated in this memorandum opinion and order, the motion is granted in part and denied in part.

### Facts [3]

At 8 p.m. on September 23, 1987 Skahill, Zalatoris, Paluch, Rogers, Washington and several other City police officers, acting on a tip that a drug purchase was about to take place, raided an apartment at 4229 South Calumet Avenue in Chicago (¶ 7). East and several others were then in one of the apartment's bedrooms. When he heard the officers approach, East placed a small packet of cocaine in his mouth (¶ 8).

After entering the apartment the officers ordered East and the other individuals into the hallway, forced them to place their hands on the wall and began to search them (¶ 9). During the search an unnamed officer asked East, "Are you ready?" East did not respond (¶ 10). When the same officer repeated the question, East swallowed the packet of cocaine he had been holding inside his mouth and asked, "Ready for what?" That produced the response "Ready to die, nigger," and the officer then struck East across his back with a club (¶ 11).

All the officers then continued to conduct a lengthy and abusive search of East (¶ 12). After a "considerable" (though unspecified) amount of time, the officers took East and the others to the police wagon (id.). After they had spent some 30–45 minutes in the wagon, East and the others were driven to the Second District Police Station (id.).

When they arrived at the station, East and several other arrestees were placed in an interrogation room with three police officers (¶ 13). Around midnight East began displaying nervous and fidgety behavior (¶ 14). He asked for water, and Skahill took him to the bathroom and then returned him to the interrogation room (id.).

Once back in the interrogation room East began pacing and shouting "Sergeant, Sergeant, Lieutenant, Lieutenant." He then removed the top of a stand-up ashtray and began beating on the desk while repeating "Sergeant, Sergeant, Lieutenant" (¶ 15). Skahill, Rogers and several unnamed officers ran into the interrogation room (¶ 16). East ducked under the desk (id.), and the officers began pulling East out from there (¶ 17). In the process the officers kicked East in the head and between the legs and hit him with a night stick—all in an attempt to handcuff him (id.).

East was then taken out of the interrogation room (¶ 18). Two individuals who had been arrested with East told Skahill that East had ingested ⅟₁₆ gram of cocaine and that he needed medical attention (id.). Skahill ignored the warnings and responded that East "was just afraid to go to jail where his brother is" (id.).

Another individual arrested with East[4] then told another unnamed officer that

---

**1.** All further references to Title 42 will simply take the form "Section—."

**2.** Perrijean filed the Complaint after defendants had submitted their initial memorandum on their Rule 12(b)(6) motion targeting the first Amended Complaint. That change in midstream has complicated resolution of the motion, for Perrijean has attempted to cure some of the previously-identified flaws via the Complaint, while she contests others in her responsive memorandum. Defendants in turn have not bothered to identify in any detail which areas they still consider defective and which of the asserted flaws have been cured. Instead they have filed a seven-page reply brief with a minimum of case citations, essentially repeating the arguments in their first memorandum.

**3.** Familiar Rule 12(b)(6) principles require this Court to accept as true all of Perrijean's well-pleaded factual allegations, drawing all reasonable inferences in her favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir. 1987) (per curiam)). All Complaint allegations will be cited "¶ —."

**4.** Perrijean never identifies either this arrestee or the two individuals who had told Skahill of East's ingestion of cocaine.

East had ingested cocaine and needed medical attention (¶ 19), asking the officer to check on East (*id.*). At that time East was lying on the floor of his cell (¶¶ 19–20). That officer responded that East was asleep and snoring (¶ 20).

At about 1 a.m. fire department paramedics arrived at the station (¶ 21).[5] They treated East in the parking lot (*id.*), then took him to Chicago Osteopathic Hospital, where he died at 2:20 a.m.

### Threshold Matters

Two preliminary matters merit brief attention before this opinion turns to the parties' contentions. One will be resolved although the parties have not addressed it, while the other will not be resolved precisely because the parties have not addressed it.

First, Perrijean's allegations against unidentified persons force this court to analyze claims against necessarily nonresponding parties—one of the problems inherent in the use of "John Doe" defendants. Despite such problems, our Court of Appeals (drawing on *Bivens'* tacit approval of such practice) has on more than one occasion allowed such pleading where the defendants are identifiable persons, though their identity is unknown at the time suit is filed, and where discovery procedures are likely to lead to their identification. Most recently *Smith–Bey v. Hospital Administrator*, 841 F.2d 751, 759 (7th Cir.1988) spoke to such a situation:

> The real problem with Smith–Bey's claim is his inability to specifically state the names of the correctional staff who were allegedly responsible for having him assaulted. This does raise questions as to the strength of his claim. The mere inability to state the individual defendants by name, however, does not warrant dis-

missal of a claim if the allegations in the complaint allow for the specific persons to be subsequently identified with reasonable certainty. *See Chavis v. Rowe,* 643 F.2d 1281, 1290 n. 9 (7th Cir.), *cert. denied,* 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981); *Maclin v. Paulson,* 627 F.2d 83, 87–88 (7th Cir.1980); *cf. Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 390 n. 2, 91 S.Ct. 1999, 2001 n. 2, 29 L.Ed.2d 619 (1971). Here, Smith–Bey's complaint does name the allegedly responsible persons by position and the complaint's factual allegations appear to allow for the specific persons to be identified with reasonable certainty. Accordingly, we reverse the district court's dismissal of this claim as frivolous under § 1915(d).

▇ At least for purposes of the present motion, then, the several unidentified defendants cannot be stricken simply because they are unnamed. Their status will be reviewed along with that of the named individual defendants.[6]

Second, neither defendants' motion nor Perrijean's response has spoken at all to Count V. This Court should not have to do the parties' work for them. As this opinion's later discussion reflects, both sides' submissions on the issues raised by Counts I–IV are sketchy (though that must be laid principally at Perrijean's door), compelling extensive independent research by this Court. But forcing this Court to start from scratch on Count V is just too much. This opinion therefore expresses no view either way on that claim.

### Perrijean's Substantive Claims
### Count I: Section 1981

▇ Count I advances a Section 1981 claim against City and the individual offi-

5. Again the Complaint contains a gap: It does not say who had notified the paramedics.

6. What makes evaluation of Perrijean's Complaint even more difficult is not the mere presence of the unidentified defendants, but how they are treated in the pleading. Because three separate episodes are dealt with and because Perrijean's counsel are careless in such matters as the use of indefinite antecedents, both defendants' counsel and this Court have had consider-

able difficulty in understanding just who are alleged to have done what. That has created special problems in treating with issues of discriminatory intent (which must necessarily be deduced from inferences based on the objective facts—the climate in which particular defendants acted or failed to act) and of conspiracy. All this will become more clear in the course of this opinion's analysis.

cers. Section 1981 "protects against discrimination on the basis of race or alienage" (*Bell v. City of Milwaukee*, 746 F.2d 1205, 1232 (7th Cir.1984)) and is actionable only when there is:

1. an intent to discriminate (*Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 2590 n. 16, 81 L.Ed.2d 483 (1984) and cases cited there)

2. involving one of the rights enumerated in the statute.

Here defendants do not challenge the second of those elements, given the wealth of authority holding that physical abuse—such as the beatings and lack of medical care alleged in the Complaint—falls within Section 1981's ambit (see, e.g., *Mendez v. Rutherford*, 687 F.Supp. 412, 415–16 (N.D. Ill.1988); *Spriggs v. City of Chicago*, 523 F.Supp. 138, 146–47 (N.D.Ill.1981); see generally *Bell*, 746 F.2d at 1232, quoting *Hall v. Pennsylvania State Police*, 570 F.2d 86, 91 (3d Cir.1978)). Instead, defendants attack the first element of the Section 1981 claim because of the claimed absence of allegations of intentional discrimination.

### 1. Individual Defendants

*Minority Police Officers Association of South Bend v. City of South Bend, Indiana*, 801 F.2d 964, 967 (7th Cir.1986) typifies the frequent cautions from our Court of Appeals "that conclusory allegations of generalized racial bias do not establish discriminatory intent." Nor is it alone in delivering that message: For example, *Albert v. Carovano*, 824 F.2d 1333, 1341 (2d Cir.), *modified on reh'g*, 839 F.2d 871 (2d Cir.1987), teaches that "naked assertions" of discrimination cannot suffice to establish a Section 1981 claim.

Here the Complaint contains no direct allegations of intentional racial discrimination on the part of the named defendants. But it *does* advert to the outrageous "Ready to die, nigger" statement by an unnamed officer, who then clubbed East (¶¶ 10–11). Although none of the named defendants is said to have joined in either of those actions during the arrest, there is case law holding that an officer's failure to intervene in constitutionally violative conduct by a fellow officer may be independently actionable (see, e.g., this Court's opinion in *Smallwood v. Renfro*, 708 F.Supp. 182, 190 (N.D.Ill.1989), discussing *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972) and *Rascon v. Hardiman*, 803 F.2d 269, 276–77 (7th Cir.1986)). Even though the unidentified officer's statement and actions alleged in the Complaint may have occurred too quickly for anyone to prevent them, the failure of the named officers to intervene afterwards (or even to remonstrate with their fellow officer), coupled with their own alleged involvement in physical mistreatment of East afterwards, can reasonably be read (with the required pro-Perrijean inferences) to imply racial animus on their part too.

Those same inferences of racial animus would not have attached to the events back at the police station, considered alone. As to those events the Complaint asserts—in purely conclusory fashion—that the use of force in the interrogation room and the failure to provide medical care were racially motivated. But there are no *facts* suggesting such discriminatory intent (other than the fact that East was black, which of course is not enough by itself). And that means no Section 1981 claim is sustainable against any officer or officer who was involved in those events alone.

▌ In pleading terms, however, the first instance of alleged racial discrimination at the time of arrest is enough to salvage the Section 1981 claim against the named individual defendants. And plainly the claim survives against the unnamed officer who engaged in the overtly discriminatory activity. No dismissal of the Section 1981 count is called for against any individuals who were on the scene at the time of the arrest.

### 2. City

Count I ¶ 30 reads:

The defendant City of Chicago is liable for the conduct of its employees, the individual Defendants named in this complaint as alleged above, pursuant to 42 U.S.C. Section 1981.

That plainly speaks solely in respondeat superior terms, not on the basis of direct City responsibility. It is well established, of course, that only such direct responsibility is actionable in Section *1983* cases under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978) and its progeny. As for Section *1981* liability, Perrijean has similarly been overtaken by the recent decision in *Jett v. Dallas Independent School District*, ─── U.S. ───, ───, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989):

> We hold that the express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts" protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.

■ *Jett* controls here. Respondeat superior claims are no more actionable under Section 1981 than under Section 1983. Perrijean's Section 1981 claims against City are dismissed.

### Count II: Section 1983[7]

Section 1983 requires a plaintiff to prove (*Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Bailey v. Andrews*, 811 F.2d 366, 371 (7th Cir.1987)):

1. deprivation of a federal right

2. by someone acting under color of state law.

Again defendants dispute only one element of the claim. Because the second factor is unchallenged, their dispute centers on the sufficiency of the Complaint's allegations as to the first.

Count II is extraordinarily difficult to parse. Perrijean asserts claims both personally and on behalf of East—and in the latter respect, her purported claims implicate a number of different constitutional rights and principles. And as if that were not enough, she lumps together the individual named defendants, certain unnamed officers, certain unnamed supervisors and City.

Unfortunately, rather than analyzing the several claims under the varying standards that govern them, the litigants' memoranda talk in generalities. Because proper analysis demands a more extended discussion than the parties have provided, once again they have greatly increased this Court's work.

1. *Individual Officers (Both Named and Unnamed, But Excluding Unnamed Supervisory Personnel)*

As suggested by the factual statement, Perrijean's claims against individual defendants arise from three separate events:

1. use of force during the arrest;

2. use of force at the station; and

3. failure to provide medical care at the station.

Because those claims raise differing constitutional issues, they must be looked at separately.

(a) Use of Force During the Arrest

Just two months ago *Graham v. Connor*, ─── U.S. ───, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (emphasis in original) eliminated any doubt that claims of excessive force during an arrest must be tested by Fourth Amendment standards:[8]

---

**7.** As an initial matter, there is no dispute that the Section 1983 claim survives East's death under the principles of *Bennett v. Tucker*, 827 F.2d 63, 67–68 (7th Cir.1987) or that Perrijean is the appropriate representative of East's estate.

**8.** As always, this opinion adheres to the conventional and convenient (though technically im-

precise) practice of referring to the Fourth and Eighth Amendments' underlying Bill of Rights provisions (which of course impose limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

Today we make explicit what was implicit in [*Tennessee v.*] *Garner*'s [471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)] analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

*Graham, id.* at 1872 (citations omitted) went on to provide guidance in evaluating the "reasonableness" of such conduct:

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, ... nor by the mistaken execution of a valid search warrant on the wrong premises.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," ... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their

underlying intent or motivation.... An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

■ In those terms there is only one possible conclusion: All defendants except the unnamed individual who struck East during the arrest must be dismissed from this portion of Count II.[9] None of the named individual defendants is alleged to have used any force at all on East. True enough, ¶ 12 says the individuals conducted a "lengthy and abusive search of RAY EAST," but that kind of conclusory generality does not suffice under *Graham.*

Once more the allegations against the unnamed individual, however, compel his (or her) retention in Count II. He (or she) is alleged to have struck East with a club and without any hint that such force was called for (¶ 11). Under *Graham* the motion to dismiss that individual is denied.

(b) Use of Force at the Station

*Graham*, 109 S.Ct. at 1871 n. 10 states the Court has not resolved the question whether the Fourth Amendment continues to apply during the period after arrest and before pretrial detention begins. But just one month before *Graham* that issue was resolved for this Circuit when *Wilkins v. May*, 872 F.2d 190, 195 (7th Cir.1989) held claims of police brutality in the post-arrest, pre-charge stage are to be measured by Fourteenth Amendment standards. Noting that the concept of "liberty" has been interpreted to include freedom from severe bodily harm, *Wilkins, id.* ruled that plaintiffs:

must show misconduct that a reasonable person would find so beyond the norm of proper police procedure as to shock the conscience.... [10]

9. Perrijean has sought to plead almost every known theory of liability (and even some that are unknown!) under Section 1983. That attempt to be all inclusive has yielded a welter of confusing allegations. Because Perrijean has *not* essayed any Section 1983 claim against the individuals for failure to intervene at this point (presumably an intended omission, given the later-discussed inclusion of such a claim as to

events at the station), this opinion has not considered that matter either.

10. [Footnote by this Court] One question *Wilkins* does not resolve in terms is whether the four-part test outlined in *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir.1973)—one that depends, in part, on the officer's subjective good faith use of force—plays any part in the analy-

■ Perrijean alleges that Skahill, Rogers and several unnamed officers kicked East in the head and between the legs and hit him with a night stick (¶ 17). Maybe the proof, rather than the pleading, will disclose that to have been a justifiable response to East's admittedly unusual behavior. But at this stage—with Perrijean entitled to all reasonable inferences (see n. 3)—that use of force must be deemed unreasonable. Accordingly the motion to dismiss those defendants is denied.

■ Different considerations bear on the other named officers—Zalatoris, Paluch and Washington. As to them ¶ 17 alleges (on information and belief) that they failed to *intervene* to stop the beating. At first glance that seems at odds with ¶ 16, which speaks only of Skahill, Rogers and several unknown officers as having run into the interrogation room when East started yelling. But it may be a reasonable inference from the ¶ 17 allegation that Zalatoris, Paluch and Washington were already in the room when the others entered. That is enough to sustain this Count II claim as to them as well, and their dismissal motion is also denied.

(c) Failure to Provide Medical Care

■ *Matzker v. Herr,* 748 F.2d 1142, 1147 (7th Cir.1984) (footnote and citation omitted) defines the measure of a Section 1983 claim for failure to provide medical care to a pretrial detainee (as East was here):

[A] pretrial detainee's due process right to be free from punishment is violated when a jailer fails to promptly and reasonably procure competent medical aid for a pretrial detainee who suffers from a serious illness or injury while confined.

Such a Fourteenth–Amendment–based test applies because the Eighth Amendment's prohibition against cruel and unusual punishment does not attach until after conviction (see, e.g., *Wilkins,* 872 F.2d at 193).

There is, however, some uncertainty as to what degree of culpability is necessary in a situation such as this one. Under the Eighth Amendment, the seminal case of *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) says the plaintiff must prove "deliberate indifference to serious medical needs of prisoners" on the part of prison authorities. Understandably our Court of Appeals has held (*Martin v. Tyson,* 845 F.2d 1451, 1457 (7th Cir.1988) (per curiam), citing *Matzker* ):

An act or practice that violates the eighth amendment also violates the due process rights of pretrial detainees.

But on the obverse side of the coin, *City of Canton, Ohio v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1204 n. 8, 103 L.Ed.2d 412 (1989) has said during the Term just ended:

[T]his Court has never determined what degree of culpability must be shown before the particular constitutional deprivation asserted in this case—a denial of the due process right to medical care while in detention—is established. Indeed, in *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 243–245, 103 S.Ct. 2979, 2982–2983, 77 L.Ed.2d 605 (1983), we reserved decision on the question of whether something less than Eighth Amendment's "deliberate indifference" test may be applicable in claims by detainees asserting violations of their due process right to medical care while in custody. We need not resolve here the question left open in *Revere* . . . .

It is thus an open question whether something less than "deliberate indifference" to East's medical needs would establish a Fourteenth Amendment violation here. Again this opinion need not face the issue, for even under the more stringent Eighth Amendment standards a claim exists against Skahill.

sis. Before *Graham* some courts routinely applied *Glick*'s Fourteenth Amendment analysis to claims of unreasonable force during an arrest. *Wilkins,* 872 F.2d at 193 cites *Glick* approvingly for the proposition that due process analysis applies to the post-arrest and post-charge but pre-conviction stage. Quaere whether that im-

pliedly approves the subjective component of *Glick*—after all, a fair reading of *Wilkins* rather suggests an objective test very much like that later announced in *Graham.* Here that question can await future resolution, for the ensuing text discussion shows that defendants cannot be dismissed now under either standard.

■ Two unnamed arrestees explicitly told Skahill that East had ingested 1/16 gram of cocaine and he needed medical attention (¶ 18). Yet Skahill ignored the warning and responded only that East was "afraid to go to jail" (*id.*). With East having just been arrested for a drug-related crime, the statement that he had ingested cocaine was at least plausible as a way for him to attempt to do away with evidence. Nonetheless Skahill callously ignored the warning without any effort to check it out. That certainly evidences deliberate indifference, enough for an Eighth Amendment—and under *Martin* a Fourteenth Amendment—violation.

■ After East was placed in a cell, an unnamed arrestee told an unnamed officer that East needed medical attention (¶ 19). That unnamed officer did check on East, finding him asleep on the floor (¶¶ 19–20). It is certainly a closer call whether that reflected deliberate indifference: After all, the very act of checking on East seems inconsistent with a deliberate indifference to his medical needs. But given Perrijean's entitlement to all reasonable inferences, the reference to the unnamed officer cannot now be stricken. On the allegations it is possible that officer was actionably indifferent—he could have entered the cell for a closer look or called someone with more medical expertise to examine East.

All other individual defendants, however, must be dismissed. *No* allegations suggest that anyone other than Skahill and the unnamed officer was put on notice of East's condition. Hence no defendant other than those two is potentially liable for the deprivation of medical care.

## 2. *Unnamed Supervisors*

Count II ¶¶ 36 and 37 seek to state a claim against certain supervisory personnel for events during the course of East's processing at the station:

36. The watch commander and other supervisory personnel at the second district police station during the course of RAY EAST's processing, knew or should have known of RAY EAST's need for emergency medical treatment and should have ordered same in a timely fashion in that; RAY EAST yelled and called for supervisory personnel, but was responded to with a sever[e] beating by the individual defendants; other persons arrested with RAY EAST specifically told individual defendants that RAY EAST had swallowed cocaine; that the behavior of RAY EAST was so unusual as to reasonably require that supervisory personnel be alerted to the possible need for medical attention to be rendered to RAY EAST.

37. The watch commander and other supervisory personnel owed RAY EAST and Plaintiff a duty to properly supervise the individual defendants under their authority and failed to do so. Such failure to properly supervise individual defendants as set forth in the above paragraph was a proximate cause of RAY EAST's injuries and death.

As to such supervisory liability *Rascon*, 803 F.2d at 273–74 draws together earlier precedents into a useful summary:

In *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983), this court stressed that "[s]ection 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." (emphasis in original); *see also McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir.1982); *Adams v. Pate*, 445 F.2d 105, 107 (7th Cir.1971). "Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official. A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf–Lillie*, 699 F.2d at 869. In short, "[i]ndividual liability for damages under section 1983 is predicated upon personal responsibility." *Schultz v. Baumgart*, 738 F.2d 231, 238 (7th Cir. 1984).

\*    \*    \*    \*    \*    \*

[T]o establish a claim against a supervisory official, there must be a showing that the official knowingly, willfully, or at least recklessly caused the alleged

deprivation by his action or failure to act. As this court said in *Smith v. Rowe*, 761 F.2d 360 (7th Cir.1985):

> To recover for damages under 42 U.S.C. § 1983, a plaintiff must establish defendant's personal responsibility for the claimed deprivation of a constitutional right. *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir.1981). However, a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.

■ No factual allegations here suggest any personal involvement on the part of the unnamed supervisors. Instead Perrijean attempts to impose liability merely because they supervised the actual wrongdoers. But case after case has rejected such liability (see, e.g., *Smallwood*, 708 F.Supp. at 189). Because no supervisors have been identified and therefore served with process, the appropriate relief is to strike Count II ¶¶ 36 and 37.[11]

### 3. *City*

Perrijean alleges City is liable under two theories:

1. It has a custom or practice of acquiescing in unconstitutional beatings and other excessive force by its officers (¶¶ 28–30, 32).

2. It failed to train its officers adequately:

(a) in the appropriate use of force (¶ 32) and

(b) in observing and responding to the medical needs of prisoners (or arrestees) (¶ 33).

Each theory requires separate consideration.

■ As for the first, it amounts to nothing more than a claim that City acquiesced in prior misconduct. That approach is foreclosed by *Strauss v. City of Chicago*, 760 F.2d 765, 767–70 (7th Cir. 1985), under which no plaintiff may merely assert the existence of a policy or custom without alleging specific facts evidencing its existence.[12] Perrijean has not done that here. No *facts* indicate anything other than an isolated incident.

■ Perrijean does allege that the policy or custom is evidenced by the City's failure to discipline the officers (Count II ¶ 28) and by the "overwhelming number of cases alleging similar unconstitutional violations as this case filed against the City each year" (Count II ¶ 29). Neither allegation does the job:

1. As for the first factor, it is insufficient for the same reason that one swallow does not make a summer: City's asserted acquiescence *in this case* says nothing about the existence of a "custom or practice" of acquiescence.

2. As for the second, Perrijean's counsel (himself formerly City's Corporation Counsel) of course knows that a *filed* case is not necessarily a meritorious one. Perrijean has alleged no facts indicating that the volume of actually *successful* lawsuits indicates the claimed custom or practice.

---

11. Def. Mem. 10 finds it unclear—as does this Court as well—whether Perrijean seeks to sweep the unnamed supervisors into the policy or custom net sought to be cast to capture City (discussed next in the text). Any such attempt must fail in any event. No allegations in the Complaint attribute authority to any of the unnamed supervisors to make municipal policy (*City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 924–26, 99 L.Ed.2d 107 (1988) (plurality opinion by Justice O'Connor)). That is equally true of the named individual defendants.

12. See also this Court's opinion in *Landstrom v. Illinois Department of Children and Family Ser-*

*vices*, 699 F.Supp. 1270, 1276 (N.D.Ill.1988). As to *Strauss'* insistence on specific fact pleading, this Court has previously expressed its concern as to the Catch–22 potential created when a plaintiff has not had the opportunity to engage in discovery (see, e.g., *Payne v. City of LaSalle*, 610 F.Supp. 606 (N.D.Ill.1985)). In this instance the survival of some of Perrijean's claims, and thus the nondismissal of the case itself, should eliminate that problem (there is the possibility that future discovery might justify City's reinsertion as a defendant).

In its present form, then, this branch of the claim against City succumbs to the unmet demands of *Strauss.*[13] But because those defects may perhaps be cured by better pleading, a second problem with the claim merits brief discussion. *City of Canton,* 109 S.Ct. at 1206 has just reconfirmed the basic principle that in Section 1983 cases a municipality may be held liable only if its actions actually *caused* plaintiff's injury.[14] That causation requirement was imposed because imposing liability "under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell,* 436 U.S. at 693–694" [98 S.Ct. at 2037–38] (*id.,* 109 S.Ct. at 1206).[15]

Here the Complaint is totally silent on that issue. No allegations suggest, for example, that the officers knew about City's alleged policy or their unconstitutional actions stemmed from that policy. In short, Perrijean has not satisfied *City of Canton*'s requirement that the alleged policy actually caused East's injuries. That provides another independent basis for dismissing the claim.

That last-discussed factor also applies to Perrijean's failure-to-train claim. But even apart from the causation issue, *City of Canton,* 109 S.Ct. at 1204–06 (footnotes omitted) defines the substantive prerequisites of such a claim:

We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indiffernece to the rights of persons with whom the police come into contact.

\* \* \* \* \* \*

*Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.

**13.** It is unclear whether Perrijean is also asserting a policy or custom of failing to observe and monitor arrestees for signs of illness or injury. To the extent that is more readily classified as a failure-to-train problem, it is discussed next in the text. But if Perrijean is rather attempting to assert City's policy of acquiescing in numerous failures to provide medical care by officers, she would again fail *Strauss'* requirements. Any such claim must be dismissed.

**14.** Cf. Justice Brennan's concurring opinion in *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 830–31, 105 S.Ct. 2427, 2439–40, 85 L.Ed.2d 791 (1985), cited with approval in *City of Canton,* 109 S.Ct. at 1206 n. 12.

**15.** As the ensuing text discussion reflects, *City of Canton* spoke to the causation issue in the context of a claim based on the municipality's failure to train its officers adequately. But the principle applies with equal force to Perrijean's claims based upon City's alleged policy or custom of acquiescence. *City of Canton*'s discussion of the causation standard confirms its general applicability.

■ Perrijean meets that standard in charging City with a failure to train its officers in the use of force. Because the appropriate use of force is a problem regularly encountered in police work, every officer must be trained to know when and how much force to use in the variety of taxing situations he or she is likely to face.[16] Surely the need to provide such training is " 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights" (*id.* at 1205 n. 10). That portion of Count II stands.

However, the same cannot be said of Perrijean's claim of City's failure to train officers in observing and responding to medical needs of prisoners (the specific failure-to-train issue involved in *City of Canton, id.* at 1206). In this instance that claim relates to the officers' failure to recognize and correct the effects of East's cocaine ingestion. To be successful it must rest on the notion that City should have trained its officers to recognize the medical symptoms of drugs taken in non-user quantities and to respond accordingly.

■ If City had knowledge of such past occurrences with enough frequency to call for training ordinary officers in that respect—and if it failed to respond to that need—it might be characterized as having exhibited "deliberate indifference" within the meaning of *City of Canton.* But that likelihood is sufficiently remote so that it is hardly surprising that Perrijean alleges nothing about City's knowledge of medical problems stemming from such large-quantity drug ingestion among its arrestees. By contrast with the use of force problem, if cannot be said the situation is "so obvious" that City should have recognized it. That component of the failure-to-train claim is dismissed.

### 4. *Perrijean's Personal Claim*

■ Perrijean alleges a "protected liberty interest in her continued association with her son, Decedent, RAY EAST" (Count II ¶ 25). *Bell,* 746 F.2d at 1243–45 confirms the right to parental association is a liberty interest protected by the Due Process Clause—a right that cannot be terminated without stringent procedural protections.

Defendants never address that claim, apparently conceding its sufficiency. It will stand.

### *Count III: Sections 1985(3) and 1986*[17]

Perrijean Mem. 7 confirms Count III asserts a claim under Section 1985(3). *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971)) outlines the elements of such a claim:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

In turn *Scherer v. Balkema,* 840 F.2d 437, 441 (7th Cir.1988) has recently quoted the *Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) definition of a civil conspiracy as:

a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon

**16.** In a Section 1983 case tried before this Court, which ultimately generated a landmark opinion in a different respect (*Marek v. Chesny,* 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985), and see earlier opinions at 720 F.2d 474 (7th Cir.1983) and 547 F.Supp. 542 (N.D.Ill.1982)), Perrijean's counsel (who represented plaintiff in that case) produced expert testimony to precisely that effect.

**17.** Perrijean Mem. 7 acknowledges no conspiracy claim is warranted against City. Count III is directed only against individual defendants.

another, and an overt act that results in damage.

And as for pleading a conspiracy, *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir.1985) (citations omitted) prescribes:

> Therefore, in a section 1985(3) action, the complaint must simply plead sufficient facts from which a conspiracy can be inferred; the facts detailing the conspiratorial agreement can be pleaded generally, while those facts documenting the overt acts must be pleaded specifically.

In addition to the conspiracy element, Perrijean must also show a race-based discriminatory purpose. *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798 (footnote omitted) established that a Section 1985(3) claim requires allegations of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" (accord, such cases as *Hossman v. Blunk*, 784 F.2d 793, 797 (7th Cir. 1986) (per curiam); *Lowe v. Letsinger*, 772 F.2d 308, 311 (7th Cir.1985)). That requirement flows from the second listed element of the cause of action—the one requiring an intent to deprive of equal protection or equal privileges and immunities.

All three episodes referred to in the Complaint require examination within that matrix of legal principles. In that context the first and third episodes are nonactionable, while the second presents a viable claim.

■ As for events during the arrest, Perrijean alleges only that *one* officer vilified East in racial terms, then clubbed him. Even though the already-discussed failure of other officers to react (coupled with their own later—and assumedly unconstitutional—beating of East) creates a reasonable inference that they too had a racial animus, nothing even hints that the unnamed officer's conduct was the product of any tacit—let alone express—agreement with those officers. No conspiracy claim will lie in that respect.

■ At the station, however, there *is* an allegation (which must be credited) of concerted action: Skahill, Rogers and other unnamed officers beat East. That is enough to supply the conspiracy ingredient

under the cases. On the racial animus front, Perrijean Mem. 6 correctly cites *Lenard v. Argento*, 699 F.2d 874, 883 (7th Cir.1983) for the obvious proposition that racial epithets may provide evidence of such animus. And it has already been held there is enough here to support a reasonable inference that the animus overtly expressed by the unnamed officer during the arrest was also covertly present in Skahill and Rogers (and in any unnamed officers present at the arrest who later participated in the station beating). Given both conspiracy and racial animus, Perrijean has stated a Section 1985(3) claim against Skahill, Rogers and such other unnamed officers (if there were any).

Perrijean also asserts a claim under Section 1986:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented....

*Grimes v. Smith*, 776 F.2d 1359, 1363 n. 4 (7th Cir.1985) (citations omitted) teaches the obvious:

> [L]iability under § 1986 is derivative of § 1985(3) liability; without a violation of § 1985(3), there can be no violation of § 1986.

Because the only arguable Section 1985(3) claim is limited to the episode at the station and the persons identified earlier in this section, Section 1986 liability could attach only to others on the scene who could have prevented East's stationhouse beating but did not. Because of Perrijean's undecipherable amalgam of named and unnamed defendants, this Court has no way of knowing whether anyone fits that description. All that can be done is to state the operative principle and await Perrijean's repleading.

### Count IV: Wrongful Death Under Illinois Law

Count IV states a pendent claim for wrongful death under Ill.Rev.Stat. ch. 70, ¶ 1:

Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

Perrijean advances claims against all defendants in both her individual and her representative capacity. Defendants do not seek to dismiss Count IV but instead say it is deficient in three respects:

1. Collateral heirs must allege actual pecuniary loss to recover under the statute.

2. Pain and suffering allegations are not proper components of a wrongful death claim.

3. Excessive force allegations are inappropriate here.

■ *Johnson v. Village of Libertyville,* 150 Ill.App.3d 971, 973, 104 Ill.Dec. 211, 213, 502 N.E.2d 474, 476 (2d Dist.1986), citing *Knierim v. Izzo,* 22 Ill.2d 73, 78, 174 N.E.2d 157, 160 (1961) and *In re Estate of Fields,* 588 S.W.2d 50, 53 (Mo.App.1979) (applying the Illinois statute), says a statutory wrongful death action:

is not one brought on behalf of an estate, nor is it a remedy for any injury to the decedent, but rather seeks to protect specific survivors and compensate them for the pecuniary loss they may have sustained by reason of the death of the injured person.

Even though the action is brought in the name of decedent's personal representative (Ill.Rev.Stat. ch. 70, ¶ 2), Perrijean really acts not in her normal capacity as adminis-tratrix but rather as statutory trustee on behalf of herself and East's next of kin (*Fields,* 588 S.W.2d at 53, citing numerous Illinois cases). She is no more than a nominal party (*id.*). That means attention must focus on the rights of the next of kin and not of the estate as such.

■ In that respect defendants cite *Prendergast v. Cox,* 128 Ill.App.3d 84, 88–89, 83 Ill.Dec. 279, 281, 470 N.E.2d 34, 37 (1st Dist.1984) for the proposition that collateral heirs must allege pecuniary loss to state a claim. *Prendergast, id.* does hold that collateral heirs (such as East's brothers and sisters) do not share in the presumption of pecuniary damages, as do lineal heirs—instead they must *prove* such damages. But defendants overstate *Prendergast* by arguing that those damages must be alleged to state a claim. *Gustafson v. Consumer Sales Agency, Inc.,* 414 Ill. 235, 244–45, 110 N.E.2d 865, 870 (1953) (citations omitted, emphasis added) states precisely the opposite:

Inasmuch as the Wrongful Death Act confers the right of action for the benefit of the surviving "next of kin" who have suffered pecuniary damages as a result of the death of the decedent, it is evident that good pleading would dictate that each of the next of kin should be named along with an allegation of their relationship to the deceased, and of their pecuniary injuries resulting from his death, so that the defendant may contest the pecuniary damages as any other fact at issue in the case. However, the chief importance of all such specific allegations is in connection with the question of the amount of damages, if any, to be assessed, *and the only essential prerequisite to a statement of a cause of action, or basis for imposing liability, is an allegation of the survival of beneficiaries of the class who may recover under the statute.*

In short, the issue of pecuniary harm goes to the fact and amount of damages— an issue to be contested at trial. As with most aspects of damages, there is no need to plead the exact amount in the Complaint.

Defendants' motion to strike the collateral heirs is denied.

■ Next defendants say (albeit without a case citation) that the allegations as to East's pain and suffering are improper. They are quite right (*Graul v. Adrian*, 32 Ill.2d 345, 346, 205 N.E.2d 444, 445 (1965) (citation omitted)):

> No damages are recoverable under [the Wrongful Death Act] for pain and suffering of the deceased, nor for medical, hospital or funeral expenses, but the damages are limited to loss of support.

In this instance, Perrijean's most recent amendment has already deleted the allegations of pain and suffering, so the issue is moot.

■ Finally, defendants assert the allegations of excessive force in Count IV ¶ 30 are improper because they are unrelated to the cause of death. Again they are correct. Count IV ¶ 32 confirms that the cause of death was the failure to provide medical care. Accordingly, the allegations of excessive force are irrelevant and are stricken.

## Conclusion

Count I states a claim against all individual officers, both named and unnamed. But no claim is stated there against City, which is dismissed from Count I.

As for Count II's Section 1983 causes of action:

1. Perrijean states a valid claim only as to the unnamed defendant as to the use of force at East's arrest.

2. There is also a valid claim as to use of force at the station, this time against all individual defendants, both named and unnamed.

3. Perrijean's claim for failure to provide medical care is viable only as to Skahill and the unnamed officer put on notice of the problem.

4. Because no claim exists as to the unnamed supervisors, Count II ¶¶ 36 and 37 are stricken.

5. City is subject to a claim for failure to train its officers in the appropriate use of force, but in all other respects the allegations against City are flawed.

6. Perrijean has sufficiently stated a personal claim for loss of a protected liberty interest.

In all other respects, the Section 1983 claims are dismissed.

Count III states a Section 1985(3) claim only as to the events at the station and only as to the defendants identified in the body of this opinion. In all other respects the Section 1985(3) claims are dismissed. No opinion is expressed as to the Section 1986 claim.

Because the Count IV ¶ 30 allegations of improper force are irrelevant to the wrongful death claim, they are stricken. In all other respects defendants' motion as to Count IV is denied.

Enough of the Complaint has failed to survive the current motion so that defendants should not be forced to sift through the rubble. Perrijean is ordered to file a Third Amended Complaint no later than July 28, 1989, and defendants shall answer or otherwise plead to that revised pleading on or before August 14, 1989. This action is set for a status hearing at 9:15 a.m. August 21, 1989.