**Jane DOE, et al., Plaintiffs,**

v.

**CALUMET CITY, ILLINOIS, et al., Defendants.**

**No. 87 C 3594.**

United States District Court,
N.D. Illinois, E.D.

Dec. 12, 1990.

Kenneth N. Flaxman, Elizabeth Dale, Chicago, Ill., for plaintiffs.

Gregory E. Rogus, Alan J. Brinkmeier, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiff class, comprising all women who have been arrested on a misdemeanor or ordinance violation in Calumet City, Illinois on or after April 16, 1982,[1] has sued

---

1. On October 1, 1987 this Court certified that class pursuant to Fed.R.Civ.P. ("Rule") 23(b)(3) (see 707 F.Supp. 343, 345 (N.D.Ill.1989)). After some consideration of whether a different starting date ought to define class participation (see *id.* (issued Feb. 6, 1989), followed by a July 17, 1989 unpublished slip opinion and an opinion issued Sept. 19, 1989 (reported at 128 F.R.D. 93)), this Court returned to the original certification date (see *id.* at 96, an opinion issued on Sept. 22, 1989). Both to avoid needless repetition and to minimize any awkwardness in locution, the rest of this opinion will simply speak of "plaintiffs" collectively, referring to the class only where necessary to the substantive discussion.

Calumet City[2] under 42 U.S.C. § 1983 ("Section 1983") for alleged unconstitutional strip searches conducted by the Calumet City Police Department. Plaintiffs now move under Rule 56[3] for summary judgment on the issue of liability. For the reasons stated in this memorandum opinion and order, plaintiffs' motion for summary judgment is granted.

### Facts

Between April 16, 1982 and the April 17, 1987 commencement of this suit, members of the Calumet City Police Department conducted a large number of strip searches of women who had been arrested for non-felony offenses.[4] All those searches were conducted without any particularized belief that any of the arrestees possessed either a weapon or contraband. While Calumet City had no formal policy regarding strip searches, its police force routinely conducted such searches without any specific justification.

Calumet City's practice of conducting strip searches was in effect and continued well after its neighboring city, Chicago, had been found liable for its own similar practice.[5] Indeed, effective September 21, 1979 the Illinois General Assembly responded to the disclosure of the Chicago Police Department's strip search policy by amending the Illinois statute governing "Rights on Arrest" to read (Ill.Rev.Stat. ch. 38, ¶ 103–1(c)):

> No person arrested for a traffic, regulatory or misdemeanor offense, except in cases involving weapons or a controlled substance, shall be strip searched unless there is reasonable belief that the individual is concealing a weapon or controlled substance.[6]

And that legislation was specifically referred to in the appeal growing out of the Chicago situation, *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1266 n. 1 (7th Cir.1983) (more of that case later). Despite the State's recognition of its municipalities' unlawful methods of searching arrestees (and despite our Court of Appeals' decision in *Mary Beth G.*), Calumet City changed its strip search practice only after this lawsuit was filed.

This action's own "Jane Doe" ("Doe") provides a typical illustration of Calumet City's strip search practice. Doe was arrested in December 1986 and charged with being underage in a tavern. Following her

---

2. Plaintiffs have also sued Calumet City's former police chief James Shutoski and Sandra Popovich ("Popovich," a police department dispatcher), but only Calumet City's liability is now at issue.

3. Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Calumet City (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987)). Although they have cited incorrectly to the subparagraphs of this District Court's General Rule ("GR") 12(m) and 12(n) requiring factual statements in support of and in opposition to Rule 56 motions, both sides have tendered such statements (cited "P. 12(m)—" and "D. 12(n)—" respectively).

4. In support of the current motion, counsel for the plaintiff class has tendered verified statements from 117 class members who were the subjects of a total of 146 strip searches. That does not of course narrow either the class defi-

nition or the class membership to those 117 women.

5. *Jane Does v. City of Chicago*, No. 79 C 789, slip op. (N.D.Ill. Jan. 12, 1982). That opinion is available on LEXIS but, as was the practice in 1982 for opinions retrieved via LEXIS, was never paginated. And because the *Jane Does* court file is in record storage, the paginated slip opinion is temporarily unavailable to this Court. However, it is a short opinion, so that this opinion's citation without reference to a particular page should not present any problem in identification. Chicago's strip search policy addressed by *Jane Does* was widely publicized: It was the subject of a week long series on WMAQ–TV and, under the banner headline of "Probe Strip–Search of Women by Police," covered all of page one of the Chicago Sun–Times on February 14, 1979 (P.Ex. 1). It also received coverage in *Newsweek* on February 26, 1979 (P.Ex. 2) and a full page in *Time* on March 19, 1979 (P.Ex. 3 at 36).

6. [Footnote by this Court] Other subsections of the same section defined "strip search" and established a whole set of procedures to be followed in conducting such searches.

arrest, Doe was transported to the Calumet City police station where she was searched by dispatcher Popovich. Popovich conducted a pat-down search and then asked Doe to raise her blouse and lift her brassiere over her breasts and then down. Popovich then required Doe to drop her jeans and pull her underpants down. Popovich had no belief at the time of the search that Doe had a weapon or contraband on her person.

Doe's case was one of many. Indeed, the offered testimony by the 117 women arrestees describing 146 strip searches includes the following typical examples:

1. On November 2, 1982 class member 6628[7] was arrested by a Calumet City police officer on a warrant for misdemeanor offenses relating to bad checks. At the police station she was required to remove her clothes.

2. On August 28, 1983 class member 6453 was arrested by a Calumet City police officer for "investigation" and eventually released without being charged. At the station she was required to remove her shirt, lift her brassiere over her breasts, lower her pants and underpants and squat.

3. On February 19, 1984 class member 6422 was arrested on a warrant. At the station she was required to remove her clothes, to squat three times and to spread the lips of her vagina.

4. On June 30, 1985 class member 5227 was arrested for deceptive practices. At the station, after she had removed her clothes a dispatcher lifted the arrestee's breasts.

5. On March 13, 1986 class member 6070 was arrested for being a minor in a tavern. At the station she was required to remove all her clothing.

6. On February 21, 1987 class member 6528 was arrested for driving with a suspended license. At the station she was required to remove her shirt and lower her pants and underpants.

In addition to being required to expose themselves, many women arrestees in Cal-

umet City were subjected to offensive touching. Again the following examples will suffice:

1. On December 5, 1982 class member 6458 (17 years old) was arrested on a misdemeanor and required to remove all her clothing. Then a female member of the department lifted the arrestee's breasts and ran her fingers along the class member's genitals.

2. On April 13, 1983 class member 5075 was arrested on a misdemeanor, required to remove all her clothing and searched by a woman who, clad in rubber gloves, felt around the class member's vagina and anus.

3. On February 12, 1986 class member 6771, arrested on a misdemeanor, was required to remove all her clothing and instructed to squat and then to bend over. While bent over, the class member felt the female searcher insert her gloved fingers into the class member's vagina and anus.

4. On June 13, 1986 class member 5737, arrested on a misdemeanor, was required to remove her clothing and was subjected to a digital cavity search by a female member of the Calumet City Police Department.

At least two arrestees (class members 5206 and 6651) were required to sit on a toilet and spread their legs, and at least one (class member 5254) was searched in that fashion in the presence of a male officer. At least 27 women arrestees were searched by male officers, including the following examples:

1. On May 18, 1983 class member 6632's breasts were fondled by a male officer.

2. On June 27, 1983 a male officer conducted a digital cavity search of class member 5319.

3. On April 18, 1984, after a female searcher had class member 6470 remove her clothing and after the class member refused to squat, two male officers en-

7. To protect their identities, the class members have been referred to in the class' evidentiary submission by numbers rather than names.

tered the room and ordered the class member to squat.

4. On August 30, 1984 a male officer strip searched class member 6697 and ordered her to squat.

5. On September 2, 1984 a male officer, clad in rubber gloves, ran his fingers along the genitals of class member 6789 and conducted a digital cavity search.

6. On September 4, 1984 a male officer fondled the breasts of class member 6789 and ran his fingers along her genitals.

7. On January 13, 1985 a male officer strip searched class member 5831.

8. On May 3, 1985 a male officer lifted the breasts of class member 5279 and felt around her anus.

9. On March 19, 1986 a male officer strip searched class member 5305.

10. On December 21, 1986 class member 5446, arrested for being a minor in a tavern, was searched by a male officer who required her to lift her shirt over her breasts.

11. On April 29, 1987 a male officer required class member 6448 (13 years of age) to strip to her underwear.

■ It is uncontroverted that the 146 strip searches described in the current submission, as exemplified by the just-completed sampling, took place.[8] Although Calumet City asserts additional facts concerning only three of the arrestees that it admits were strip searched, nowhere does it argue or offer any evidence (1) that any searching officer had any *antecedent* basis for conducting any of the strip searches or (2) that the searches did not in fact occur.

Calumet City did not have a written policy that explicitly outlined the procedures for "strip searches" (in the established meaning of that term)[9] until after this litigation began. Its pre-litigation written policies as to searches had been contained in three Police Department general orders:

1. General Order 76–3 (adopted in April 1976) and General Order 76–7 (adopted in June 1976) had required that all arrestees be searched but did not provide any explicit procedures for conducting searches incident to booking (P.Ex. 6–7).

2. In June 1984 the Police Department adopted General Order 84–4, giving some more specific guidance as to strip searches. Its relevant provisions were these:

1. Arrestees will immediately be searched when brought into the lockup booking area.

2. Searches will be conducted by department members of the same sex as the arrestee.

3. Arrestee will be scanned with a metal detecting device to ensure against concealment of a weapon not discovered on the pat down search.

\* \* \* \* \* \*

---

**8.** Calumet City's only response to the overwhelming evidence offered by plaintiffs is the testimony of three dispatchers that they did not strip search all categories of arrestees (D. 12(n) 3–4). At most that would show that not *all* persons searched by those three dispatchers and who were in one of the categories excluded from such searches by the dispatchers may have been strip searched. But Calumet City does not use that evidence to counter the specific complaints, and its failure constitutes an admission of plaintiffs' evidence of all the searches alleged (*Skagen v. Sears, Roebuck & Co.*, 910 F.2d 1498, 1500 (7th Cir.1990) and GR 12(n)).

**9.** This Court includes within the term "strip search" any exposure or observation of a portion of a person's body where that person has a "reasonable expectation of privacy" (*Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concur-

ring)). *Mary Beth G.,* 723 F.2d at 1267) (footnote omitted) described Chicago's "strip search" practice as an unwritten policy that required a female arrestee to:

1. lift her blouse or sweater and to unhook and lift her brassiere to allow visual inspection of the breast area, to replace these articles of clothing and then

2. to pull up her skirt or dress or to lower her pants and pull down any undergarments, to squat two or three times facing the detention aide and to bend over at the waist to permit visual inspection of the vaginal and anal area.

That coincides in nearly every material element with the practice in Calumet City. Any minor variations that took place from arrestee to arrestee or from searching officer to searching officer do not affect the legal consequences as discussed later in this opinion.

5. Arrestees will not be subjected to a strip search for any traffic or misdemeanor offense, unless specific factors are present which establish reasonable belief that a search will uncover a weapon or controlled substance. Strip searches will ordinarily be conducted in one of the lockup holding areas out of the view of persons not involved and then only after receiving approval from the Commanding Officer on duty. When a strip search is conducted, it must be so noted on the arrest ticket.

NOTE: Discretion and good judgment will be used when conducting a strip search. The arrestee will not be required to remain unclothed any longer than is absolutely necessary. No touching of the body cavities is permitted by department members.

If that policy had been implemented in the same spirit in which it appears to have been written, this lawsuit would have had a quite different scope—at least prospectively from the time of adoption of General Order 84–4. But somewhat unbelievably the Police Department provided no training as to General Order 84–4—nor were the dispatchers, who routinely conducted searches, even made aware that the order existed. Lacking any definition of "strip search," the order was actually understood by high ranking officers of the Police Department to permit searches of breasts and the exterior of the vagina and anus of female arrestees as long as the search did not entail the *complete* removal of their clothing.

Calumet City did not conform its strip search policy (either written or in practice) to even minimal constitutional norms until March 31, 1988 (after this action was filed),

when it published General Order 88–1.[10] That order defines strip searches as:

having an arrested person remove or arrange some or all of his/her clothing so as to permit a visual inspection of the genitals, buttocks, anus, female breasts or undergarments of such persons.

That order also prohibits the touching of body cavities by department members and requires that any search of a body cavity other than the mouth be performed only with a warrant. It was only after the adoption of that order that many of Calumet City's employees learned for the first time that a strip search included removal or rearrangement of "some or all ... clothing so as to permit a visual inspection" of an arrestee's private parts.

At no time during the class period did Calumet City require those who conducted searches to attend any formal training on search procedures, even though such training was available. Such minimal training as *was* given about searches was conducted sporadically on the job, and it did not cover the constitutional limits of search procedures. In sharp contrast, Calumet City did require its employees who were principally involved in conducting searches to attend a 40–hour course in *radio* operations—because the Police Department believed that such procedures could not be learned on the job.

■ In the absence of any training concerning the constitutional limits of their power to search arrestees, members of the Calumet City Police Department routinely conducted strip searches on females arrested for misdemeanor or ordinance offenses. As already reflected, some of those searches were conducted by male members

---

**10.** General Order 87–1 (adopted on May 22, 1987) had *said* (as part of its opening Section I, labeled "PURPOSE") that it defined "strip search" and "search" as well as some other terms. But its Section II (labeled "DEFINITIONS") contained no such definitions at all, instead using those terms without definition. All that was provided by way of substantive content was the "NOTE" that began "Discretion and good judgment ...," quoted two paragraphs back in the text of this opinion. But even if

General Order 87–1 had been more informative than it was as to the meaning of "strip searches" and the standards to be followed in conducting them, what was more significant was the fact that, as with the previous General Order, the dispatchers were not even made aware of this new General Order. And as before, even the senior members of the Police Department still believed that the term "strip search" in the new General Order did not include any search that involved only a partial disrobing of the arrestee.

of the Police Department,[11] although most of the searches were conducted by dispatchers (also referred to as Desk Clerks or Matrons). Those dispatchers testified to the following:

1. Phyllis Harrison ("Harrison") conducted searches between 1976 until October 1987, requiring women arrestees to remove their clothes down to their underwear. Harrison would also require women to remove their underwear if requested by the watch commander. On occasion Harrison would instruct the female arrestee to lift her brassiere, sometimes resulting in exposure of an unclothed breast.[12]

2. Anita Pala ("Pala") conducted searches from 1974 to 1979 and from 1980 to the present. In searching a female arrested on charges of shoplifting and prostitution, Pala would pat the woman down, require her to empty her pockets and remove her shirt, loosen her brassiere, pull it out and shake it, remove her pants and take off her underpants.

3. Nancy Panozzo ("Panozzo") conducted searches from October 1985 to October 1988 in which she routinely required any women arrestee to lift up her blouse and pull her brassiere away from her body. About half the time that maneuver would result in exposure of the woman's breast. Panozzo also required women to lower their pants and underpants, exposing the pubic area.

4. Sue Orzel ("Orzel"), a dispatcher from 1984 to the present, conducted searches of female arrestees by requiring each woman to undo or lift her blouse and lift her brassiere. Orzel would also require women to undo their jeans, at which time Orzel would run her hands along the band of the woman's underpants.

5. Patricia Ranachowski ("Ranachowski"), a dispatcher since October 1985, routinely required any woman arrestee to lift her blouse and pull her brassiere away from her body. If the woman was wearing jeans, Ranachowski would require her to unzip her jeans and roll the waistband down. If the woman was wearing a skirt, Ranachowski might require the woman to raise her skirt. When requested by the arresting officer to do a thorough search (in some drug, shoplifting and prostitution cases), Ranachowski would require the female arrestee to lower her outer pants and underpants and squat.

6. Virginia Schweitzer ("Schweitzer"), a dispatcher since 1982, had a practice of requiring each female arrestee to pull down her pants, open her blouse and pull her brassiere (if any) away from her body. On occasion Schweitzer would require the female arrestee to lower her pants and squat to see if "anything was kept internally which would then fall out" (Schweitzer Dep. 14). Schweitzer has performed that type of search for female arrestees arrested for drug offenses as well as for retail theft and prostitution.

7. Sandra Siatta ("Siatta"), a dispatcher from January 1979 to about 1985, when requested by an arresting officer to conduct a "thorough" search, would require the female arrestee to remove her underwear and in some cases require the female arrestee to squat (Siatta Dep. 15–16, 19).

---

**11.** Calumet City offered proof that *some* of the officers of its Police Department did not conduct such searches, but such evidence casts no doubt on the class members' testimony that some other male members of the department participated in such searches. At most the testimony shows that only the testifying officers did not conduct strip searches of female arrestees. Furthermore, even if only females had conducted the searches, that fact would not have rendered the searches constitutional. Calumet City's minor quibbles with the descriptions of individual searches does not change the overall effect of its unconstitutional policy (or failure to train) that resulted in routine strip searches (see, e.g., *Mary Beth G.,* 723 F.2d at 1267 n. 4, which declined to take into consideration the varying accounts of the location in which the searches were conducted, because the overall policy as described by the defendant was unconstitutional).

**12.** Harrison also testified that she did not strip search juveniles or those arrested for disorderly conduct or traffic violations.

8. Rita Peralta ("Peralta")[13], a dispatcher for an 11–month period in 1984 or 1985, routinely required women arrestees to unzip their jeans and unbutton their blouses. She also testified that she had performed that type of search on women arrested for traffic offenses.

9. Popovich, who searched "Doe" and who has been a dispatcher at Calumet City from 1985, routinely required women arrestees to lift their blouses and brassieres (exposing their breasts) and to lower their jeans and underpants to the knees and to lift them back up.

In sharp contrast to that practice of routinely strip searching women arrestees, the practice of searching male arrestees at Calumet City did not involve any removal of clothing or exposure of any private parts unless the arrestee had been arrested in a drug raid or unless there was a belief that the arrestee was concealing a weapon, narcotics or narcotics paraphernalia.

## Constitutional Standard

Plaintiffs' Section 1983 claim asserts that the entire practice of strip searches as conducted by Calumet City violated plaintiffs' Fourth Amendment right[14] to be free from "unreasonable searches." For those searches to have been unreasonable, the arrestees must have had a reasonable expectation of privacy in the areas of their bodies that were searched and the searches themselves must have been unreasonable (see *Bell v. Wolfish,* 441 U.S. 520, 558, 560,

13. Calumet City argues that Peralta "has demonstrated extreme bias against" the Police Department. If any such bias in fact existed and if this Court were to ignore Peralta's testimony entirely, the absence of that testimony would not change the outcome in this case. But Calumet City's charge that bias affected Peralta's testimony is not supported in the record. Calumet City offered no evidence to counter her testimony, and the overwhelming evidence from other dispatchers and from 117 persons in the plaintiff class fully corroborate Peralta's testimony.

14. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the Fourth Amendment's underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the

99 S.Ct. 1861, 1884, 1885, 60 L.Ed.2d 447 (1979)).

## Unreasonableness of the Strip Searches

■ As already described in some detail, each search at a minimum included an uncovering of the woman arrestee's external clothing, usually resulting in the exposure of the arrestee's breasts, buttocks, anus or vagina—and most often a combination of those body parts.[15] There is simply no question that plaintiffs had a reasonable expectation of privacy in those private parts. Deeply imbedded in our culture—at least since the first telling of Noah's exposure before his son Ham and his other sons' reaction to Noah's nakedness[16]—is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their "private" parts observed or touched by others.[17] *Katz's* maxim that "the Fourth Amendment protects people, not places" (389 U.S. at 351, 88 S.Ct. at 511) would have no meaning if people had no right to have their most private parts free from unreasonable searches.

■ As if it were not clear enough from the common understanding of the nature of our form of government that police officers do not have unlimited power to expose or to inspect the private areas of a citizen's body, ample precedent antedating the class period had made it crystal clear that the Constitution prohibits blanket strip search policies. For example, *Tinetti v. Wittke,* 479 F.Supp. 486, 491 (E.D.Wis.1979), aff'd

Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

15. To the extent that the evidence so frequently discloses even more egregious invasions of plaintiffs' persons, a fortiori reasoning applies.

16. *Genesis* 9:20–23.

17. It is scarcely to be considered an accident that long before our constitutional case law began to speak in terms of privacy, it was already an established part of our language to refer to "*private* parts" as denoting "the external genital and excretory organs" (Webster's Third New International Dictionary 1645 (1976), setting out definition d(3) of the noun "part").

per curiam by adoption of the opinion below, 620 F.2d 160 (7th Cir.1980), held that a "blanket strip search policy" of a non-misdemeanor traffic violator:

> without probable cause to believe that she was concealing weapons or contraband on her body was a violation of the plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.[18]

Quoting from an unpublished oral decision in *Sala v. County of Suffolk* (E.D.N.Y. Nov. 28, 1978), *Tinetti, id.* stated that strip searches are:

> demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.... [19]

*Bell*, 441 U.S. at 560, 99 S.Ct. at 1885 also recognized that there is a legitimate privacy interest in not being strip searched, though it also clarified that all strip searches are not unconstitutional per se (*id.* at 559, 99 S.Ct. at 1884). It explained that the government must have a reasonable justification for conducting such searches (*id.*) (citations omitted):

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell*'s balancing test clearly requires some level of justification for conducting a strip search. Courts examining the strip search issue have found that the "justification" element of *Bell* may range from "reasonable suspicion" to "probable cause to believe" that the suspects were in possession of a weapon or contraband.[20] For example, *Mary Beth G.*, 723 F.2d at 1273 (quoting from *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (footnotes and citations omitted)) teaches:

> The reasonableness standard usually requires, "at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted. Based on these principles, we agree with

---

18. [Footnote by this Court] Although *Tinetti* involved a search of non-misdemeanor traffic violators, there is no question that its reasoning applies to all blanket search policies—such as the practice in Calumet City—that make no distinctions among types of crimes or that fail to require any level of belief that a particular arrestee is in possession of a weapon or contraband. *Tinetti, id.* at 490 states plainly:
> The intrusion on one's personal dignity occasioned by such searches requires that some justifiable basis exists.

19. [Footnote by this Court] In like vein, a somewhat later opinion in *John Does 1–100 v. Boyd,* 613 F.Supp. 1514, 1522 & n. 11 (D.Minn.1985) found a blanket search policy unconstitutional and stated:
> The Court finds that the Dakota County strip search procedure, which is imposed across the board upon the whole spectrum of individuals in the community, young and old, male and female, is a dehumanizing, indecent, distasteful, and outrageous practice.[11]
> 11. One commentator has described the experience as a "visual rape." Shuldiner, *Visual Rape: A Look at the Dubious Legality of Strip Searches,* 13 J.Marsh.L.Rev. 278 (1980).

20. See, e.g., *Tinetti,* 479 F.Supp. at 491 (requiring probable cause in non-misdemeanor traffic cases) and a number of other cases citing *Tinetti: Hill v. Bogans,* 735 F.2d 391, 394 (10th Cir. 1984) (strip search of a traffic offender with "no circumstances here indicating [arrestee] might possess either a weapon or drugs" was unconstitutional); *Giles v. Ackerman,* 746 F.2d 614, 617 (9th Cir.1984) (per curiam) ("arrestees charged with minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the individual arrestee is carrying or concealing contraband"); *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981), holding such a search unconstitutional because the officer had "no cause" to believe that the detainee had a weapon or contraband and stating:
> An indiscriminate strip search policy routinely applied to detainees ... cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations.

the district court in *Jane Does* that ensuring the security needs of the City by strip searching plaintiffs-appellees was unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed.

*Mary Beth G.* affirmed *Jane Does*, which had found the City of Chicago liable under Section 1983 for its strip search policy before the beginning of the class period here. Like most of the searches at issue here, those in *Jane Does* involved a "partial disrobement and visual search."[21] And like the searches here, the central problem with those searches was that there was "no distinction ... with respect to the reason for which the arrest was made nor the grounds for searching for contraband." *Jane Does'* holding is clear:

> Strip searches for [weapons of contraband] violate the Fourth Amendment if the detainee was not arrested for reasonable grounds to believe that she had committed an offense related to the nature of the items being searched for.

In fact, the only exception that was considered by the District Court there and that was echoed by our Court of Appeals was that a strip search may be conducted (*id.*; *Mary Beth G.*, 723 F.2d at 1271 n. 7, 1273):

> if a female is arrested on reasonable grounds to believe that she is involved with narcotics, or on perhaps some other reasonable grounds to believe she has committed a crime the fruits of which might be located in her body.

**21.** Calumet City mistakenly attempts to distinguish the facts of *Jane Does* from those here by contending that the City of Chicago had a written policy. In fact, no mention was made by either the District Court or our Court of Appeals of any such written policy. Instead both courts quote not from a written policy, but from a summary of Chicago's effective policy contained in the defendant's memorandum. Indeed, there was some dispute as to Chicago's actual practice (see *Mary Beth G.*, 723 F.2d at 1267 n. 4.).

**22.** Calumet City urges that plaintiffs have failed to show for each specific search that Calumet City's officers did not have a "reasonable belief that the traffic arrestees could or may have been concealing weapons or controlled substances" (D.Mem. 7). That argument is truly empty—it

From a time well before the class period began, *Jane Does* and all the other strip search cases have universally demonstrated that one element must be present for a strip search to be held reasonable: Police officers must have some level of particularized justification to strip search an individual arrestee. Whether the proper standard is probable cause or some lesser form of particularized belief (an issue that need not be resolved on the undisputed facts in this case), the first step in the inquiry is to determine whether the members of the Calumet City Police Department had *any* justification to believe that the women they searched were in possession of any weapon or contraband that would be revealed only by the scope of the search conducted. And it is unnecessary to pause even for a moment on that preliminary inquiry, for Calumet City has failed to offer *any* evidence that its employees had any particular knowledge at the time of the searches that would give them any basis for such a belief.[22] In fact, the testimony of the dispatchers reveals that neither they nor any other officers were required to make such a determination before conducting a strip search, except in the case of male arrestees.

In summary, Calumet City cannot justify the broad pattern of strip searches that were conducted without any level of belief that the women making up the plaintiff class were in possession of a weapon or contraband. Hence the searches at issue

wholly ignores the fact that plaintiff class has shown that Calumet City had an indiscriminate and routine practice of conducting strip searches, a showing that is clearly sufficient under *City of Canton v. Harris*, 489 U.S. 378, 390 n. 10, 109 S.Ct. 1197, 1205 n. 10, 103 L.Ed.2d 412 (1989) to prove the city's liability. Calumet City has failed utterly to rebut that proof and cannot prevent a finding of summary judgment against it (see *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53). At most, if it believed that any specific searches or classes of searches had a reasonable antecedent justification, Calumet City could have offered proof that the subjects of those searches should be excluded from the class, but it has failed to do that either.

were unreasonable and thus unconstitutional.[23]

### Calumet City's Liability.

*Monell v. Department of Social Services of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) teaches that Calumet City is liable under Section 1983 only if it *caused* the constitutional deprivations alleged here:

> [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Though such causation is frequently shown by evidence of a municipality's formal legislative act (an ordinance) or its adoption of an express policy, the absence of such a formal action requiring strip searches is not at all fatal to plaintiffs' claim. *Monell, id.* at 690–91, 98 S.Ct. at 2035–36 simultaneously made it clear that a municipality can be held liable even when such a widespread practice or policy "has not received formal approval through the body's official decisionmaking channels" (see also *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir.1990)).

■ Calumet City's consistent (though unwritten) practice before 1984 is confirmed by the strikingly similar testimony of the dispatchers—evidence in every material way corroborated by the testimony of the arrestees. No significant change in that practice occurred until after this lawsuit was filed.[24] There is no doubt whatever that Calumet City had an effective, though unwritten, practice that consistently called for and imposed indiscriminately administered strip searches.

As Section 1983 jurisprudence has developed, however, that universally *practiced* deprivation of constitutional rights by a municipality's employees may not necessarily trigger municipal liability in the Rule 56 context presented here. *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (citations omitted, emphasis in original) reconfirmed the most recent articulation of the operative standard:

> As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well " 'custom or usage' having the force of law," ... the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, ... or by acqui-

---

**23.** Even if Calumet City were to offer evidence that in retrospect might have given an officer some basis for conducting a particular strip search, it cannot justify post-hoc an unreasonable intrusion without showing that each officer involved had such a reasonable basis at the time of the search (see *Katz*, 389 U.S. at 359, 88 S.Ct. at 515 (citation omitted)). Of course it would be possible for a department's procedures to give guidelines for such a belief—for example, that a suspect in a violent crime could reasonably be suspected to possess a weapon—but in the absence of any such specific policy and given the existence of a pattern of searches that clearly did not distinguish among any of the arrestees, Calumet City cannot now manufac-

ture bases in an effort to legitimize the strip searches that were inflicted on plaintiffs.

**24.** Indeed, even after 1984 Calumet City's written policy was understood to allow strip searches so long as no complete disrobement occurred and, even after 1987, to allow such searches so long as the search was conducted by a person of the same sex. Even worse, it seems most likely that those pieces of paper were not the effective policy of the Police Department: They were not given to those who routinely performed searches, nor was there any training regarding them. But because this opinion focuses on a "failure to train" theory, it is not necessary to address that last question.

escence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity....

 In this instance the relevant final policymaker was Calumet City's Police Chief Shutoski—and P.Mem. 7 n. 10 characterizes him as having denied under oath "that he consciously approved Calumet City's strip search policy."[25] At the summary judgment stage, that is enough to create a genuine factual issue. This Court may not ignore that denial by labeling it as inherently incredible in light of the overwhelming evidence of what was actually going on—for a policymaker's negligent administration or even ostrich-like blindness does not rise to the level of a "decision," as called for by *Jett.*

 But Calumet City cannot escape constitutional liability quite so easily, just by pointing to the alleged ignorance on the part of the man in charge as to his department's pervasive practices. It still remains true beyond peradventure that one or both of two types of constitutional failures by Calumet City itself was or were the primary cause of the wide pattern of unconstitutional searches proved here:

1. Whatever policy Calumet City *did* have was seriously deficient in constitutional terms.

2. Calumet City failed to train its officers adequately in the respects critical to this case.

*Gibson v. City of Chicago,* 910 F.2d 1510, 1521 (7th Cir.1990) teaches that the analyses under either an "inadequacy of policy" or a "failure to train" theory are identical. Like plaintiffs, this Court will focus its discussion on the latter theory (failure to train), because Calumet City's failure to train its employees as to the constitutional limits of their power to conduct strip searches was unquestionably the legal cause of the injuries complained of here.

In that respect *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1204 identifies as a predicate for municipal liability under Section 1983:

where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants....

*City of Canton, id.* at 390 & n. 10, 109 S.Ct. at 1205 & n. 10 (citation and other footnote omitted) explains that such "deliberate indifference" is evident when the need for training is "obvious":

[I]t may happen that in the light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.[10] In that event, the failure to provide proper training may be fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

---

10. For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in constitutional limitations on the use of deadly force can be said to be "so obvious" that the failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for training must have been so plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

It is painfully obvious (and was so substantially before the class period began) that there was a need for training in the constitutional limits of strip searches. Several factors singly compel that conclusion—and in combination they serve to bury Calumet City in this case.

25. This Court has reviewed Chief Shutoski's deposition, not only at the page cited for that proposition (Dep. 50) but in the entire section dealing with that topic. In candor, plaintiffs give his statement more credit than it deserves in that respect—but this opinion will ascribe that value to his testimony purely arguendo. As it turns out, Calumet City cannot escape liability on that basis anyway.

For one thing, in response to the public outcry following the widely-publicized disclosure of Chicago's blanket search policy, the Illinois legislature changed the state law governing post-arrest searches.[26] There is no need to equate every aspect of the Illinois statutory provision to the Fourth Amendment standards regarding searches—it is enough that the central thrust of the statute was to prohibit unjustified strip search policies.[27] It was *that* aspect of the statute that coincides with Fourth Amendment standards and that Calumet City blithely ignored.

Second, Calumet City failed to modify or implement any policy as to the constitutional limits of strip searches even after (1) *Tinetti*'s 1980 declaration by our Court of Appeals of the unconstitutionality of a blanket policy that all nonmisdemeanor traffic violators be searched and (2) the 1982 declaration in *Jane Does* (also antedating the class period in this case) that Chicago's strip search policy was unconstitutional. It is of course true that *Jane Does* was an opinion at the District Court level and that its affirmance in *Mary Beth G.* came in 1983, after the commencement of the class period (although that was still several years before this lawsuit was brought). If *Jane Does* had been the only straw then in the constitutional wind, Calumet City might have had a tenable basis for arguing that its liability should have been triggered only after the constitutional lesson had been driven home in *Mary Beth G.*[28] But that is not at all the case—instead the situation is strikingly parallel to that in *Coleman v. McLaren*, 631 F.Supp. 763 (N.D.Ill.1986), *aff'd in relevant part sub nom. Hamer v County of Lake*, 819 F.2d 1362 (7th Cir.1987), which by analogy confirms Calumet City's liability to *all* class members victimized by its strip searches, because the constitutional principle was well established *before* the class period began.[29]

Finally, Calumet City knew that its dispatchers were routinely conducting searches, and it should have been clear to the city that unless strip searches were limited there was a high probability that unconstitutional searches would result. Calumet City denies that the need for training in this area was obvious by arguing that the case here is similar to *East v. City of Chicago*, 719 F.Supp. 683 (N.D.Ill.1989), where this Court held that there was no obvious need for the City to train its offi-

---

**26.** Many of the municipalities in the Calumet City area quickly changed their official procedures to match that change in Illinois law (P.Mem. 14).

**27.** Calumet City argues (D.Mem. 2) that plaintiffs' case is mistakenly based on a violation of an Illinois statute and not on a violation of the federal Constitution. That contention misses the point that the state statute was enacted in response to Chicago's policy that was declared unconstitutional in federal terms. Thus the violation alleged in this action—the blanket search policy—is addressed by both the Illinois statute and the Fourth Amendment. Moreover, the State's response to Chicago's policy was only one factor that put Calumet City on notice that blanket strip search policies were unconstitutional. If Calumet City were arguing instead that it had merely failed to implement all the procedural requirements of the Illinois statute, it would have a point to the extent that those requirements did more than mirror the federal constitutional demands. But when Calumet City wholly failed to implement the most basic constitutional proscription against routine blanket strip searches, its effort to distinguish between state and federal law is simply off the mark.

**28.** In that event the earliest group of class members, as the class is now certified, might be deprived of any recovery for the violation of their constitutional rights.

**29.** This Court's opinion in *Coleman*, 631 F.Supp. at 765, 767 held that the Section 1983 claim of plaintiffs there was frivolous in light of existing Supreme Court precedent that had been further explicated in a district court case that paralleled *Coleman* (*Hamer v. Anderson*, 594 F.Supp. 561 (N.D.Ill.1984)). *Coleman, id.* at 765 viewed the district court opinion in *Hamer* not as controlling precedent, but as an "element in the equation" showing that the existing law was unquestionably clear as of the date of *Hamer*. That analysis was upheld on appeal, 819 F.2d at 1368–69 (and see the affirmance on a second appeal, 871 F.2d 58, 59 (7th Cir.1989)). In like fashion, *Does* broke no new ground but rather amplified the then existing legal precedent of *Bell, Tinetti* and *Logan* to the point that it was unquestionably clear by the beginning of the class period that the Fourth Amendment requires antecedent justification for strip searches.

cers to recognize the medical symptoms of drugs taken in non-user quantities.[30] That distorts the analysis in *East*, which (*id.* at 694 (emphasis added), quoting *City of Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10 (footnote omitted)) also held that "failure to train its officers in the use of force" was actionable:

> Because the appropriate use of force is a problem *regularly encountered* in police work, every officer must be trained to know when and how much force to use in the variety of taxing situations he or she is likely to face. Surely the need to provide such training is " 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."

Moreover, *East, id.*—in a holding parallel to that announced here—also stated that the other claim of the plaintiff there (involving the nonexistence of training to recognize plaintiff's drug ingestion) could have been actionable on "deliberate indifference" grounds:

> [i]f City had knowledge of such past occurrences with enough frequency to call for training ordinary officers in that respect—and if it failed to respond to that need. . . .

Compare *Gibson*, 910 F.2d at 1522 & n. 20.

In contrast to the "remote" possibility in *East* of an arrestee's large quantity drug ingestion, it is highly probable (if not dead certain) that police officers are regularly called upon to consider whether and when to conduct strip searches on arrestees. *DiLoreto v. Borough of Oaklyn*, 744 F.Supp. 610, 623–24 (D.N.J.1990) has recently examined that precise issue. There the plaintiff was arrested for questioning for involvement in a suspected car theft. At the station a female police officer was ordered to observe the arrestee as she urinated. That observation, characterized as a "strip search," was conducted without "any particularized suspicion toward plaintiff" (*id.* at 621). It was held to be an unconstitutional search caused by the *unwritten policy* of the police department to observe all female arrestees visually while they urinated (*id.* at 623). *DiLoreto, id.* at 623–24 then resolved the final question, which centered on whether the need for training regarding strip searches was so "obvious" that the Borough's failure to correct that inadequacy rose to the level of "deliberate indifference" under the *City of Canton* test:

> As can be seen from the large number of cases discussing this issue, strip searching by police ... is not an uncommon occurrence. It is something that police officers must confront daily and an area in which they should receive training. Police officers should be aware of the limits placed on their actions by the Constitution. The Borough has a responsibility to implement policies that are consistent with the Constitution and to train its officers accordingly. It is not enough for the Borough to say that it is not liable because it does not have a formal policy. Having no policy is itself a policy, and in this case, it is an unconstitutional policy. By not creating and implementing a policy and not training its employees regarding accompanying detainees to the bathroom, the Borough has expressed deliberate indifference to the fourth amendment rights of detainees. . . .

It cannot be gainsaid that Calumet City, like the Borough of Oaklyn, knew that its officers were confronting the daily opportunity to conduct strip searches. If anything beyond common sense and experience were needed to buttress that conclusion, the added ingredient is more than amply supplied by the number of arrestees who have come forward with evidence of Calu-

---

**30.** Calumet City labels that case and the one here as "needs of prisoners" cases in a supposed contrast to an "excessive force" case (see, e.g., *Kerr v. City of West Palm Beach*, 875 F.2d 1546 (11th Cir.1989)). That position is myopic (or astigmatic) in the extreme—it totally mischaracterizes this Court's decision in *East*. It also misses the main point of *Kerr, id.* at 1556:

> In *City of Canton*, the Supreme Court recognized that the frequency of constitutional violations may, in itself, provide sufficient circumstantial evidence that a municipality has chosen to allow its officers to act without adequate training.

met City's strip searches here. It must be viewed as having been painfully obvious to Calumet City that there was an unfulfilled need for training in the constitutional contours of the dispatchers' lawful power to strip search.

Despite that degree of obviousness, Calumet City did not respond to the need for training as to strip searches either with such training or with a promulgated policy. Even though Calumet City saw fit to provide a formal 40–hour course in radio procedures—because operating a radio "just isn't picked up that easy by one person telling another" (Shutoski Dep. 18)—it failed utterly to provide any training, formal or informal, as to the constitutional limits of strip searches before this lawsuit began. Many dispatchers had received informal training on the performance of strip searches, but they were never told of the lawful limits of such searches. Before 1984 Calumet City had "no *written* policy, regulation, order, or procedure addressing [post-arrest searches]" (D.Mem. 6, emphasis in original). Then the 1984 regulation did not begin to fill the vacuum: Calumet City did not promulgate it to the dispatchers, and even if it *had* distributed the order, even the leadership of the department believed that it authorized searches of "breasts, vagina, and anus of female arrestees" as long as all clothing was not removed simultaneously (Backlin Dep. 19, 26).[31] Instead the first clear policy and training that informed the dispatchers of the constitutional limits of strip searches came into being only on March 31, 1988—*after* the commencement of this action.

Nor is there the slightest doubt as to the causal nexus between Calumet City's failure to train its employees and the constitutional violations suffered by plaintiffs. Here the searches to which plaintiffs were subjected were neither isolated occurrences nor symptoms of a minor weakness in a particular officer's ability to remember her

training. They were rather part of a consistent pattern of behavior that simply would not have occurred in the department-wide manner that it did if the training had been adequate (see *City of Canton*, 489 U.S. at 391, 109 S.Ct. at 1205). No testimony suggests that the searches were conducted with any understanding other that they were authorized. There is an uncanny similarity among all the dispatchers' testimony concerning not only their practices but also their training (or more accurately in this respect, their lack of training). There is simply no possibility that any reasonable person could reach any conclusions other than (1) that Calumet City was "deliberately indifferent" to the need to train its officers in the constitutional limits of strip searches and (2) that had the officers been so trained, the pattern of searches would not have taken on the color of a practice that was so uniformly unconstitutional.[32]

### Conclusion

There is no genuine issue of material fact as to the liability of Calumet City to the members of the plaintiff class, who are entitled to a judgment as a matter of law on the issue of such liability. This action is set for a status hearing on December 26, 1990 at 9 a.m. to discuss further proceedings in this action.

---

**31.** Those same problems prevented the 1987 regulation from having any positive effect.

**32.** Of course the result is not altered by the possibility that some searches may have gone beyond what might have been Calumet City's

routine unconstitutional strip search. Any such search that may have become unusually abusive was already unconstitutional and was thus also the natural result of a policy that failed to recognize minimal constitutional limits.