# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 02-2806

LOLITA STANLEY and LARRY STANLEY,

*Plaintiffs-Appellants,*

*v.*

ANITA HENSON, female employee of Vigo County Sheriff's Department, WILLIAM R. HARRIS, in his official capacity as Vigo County Sheriff, and JEFFREY ENNEN, Lieutenant,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 00 C 53—**John Daniel Tinder**, *Judge.*

---

ARGUED MAY 28, 2003—DECIDED JULY 28, 2003

---

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* On the night of January 30, 1998, Lolita Stanley was arrested by Terre Haute, Indiana police officers, facing misdemeanor charges of battery on a police officer and resisting arrest. She was taken to the Vigo County jail, where jail officer Anita Henson guided her through the jail's admission procedures. Officer Henson first conducted a pat-down search of Ms. Stanley while she

was fully clothed; that search turned up no weapons or other contraband. Officer Henson took down Ms. Stanley's personal information, photographed and fingerprinted her.

Ms. Stanley was then required to go through the jail's clothing-exchange procedure. Officer Henson directed her to a small, doorless room near the booking area. The room was partially divided by a cinder-block wall approximately four feet in height, behind which a toilet was located. Mounted on the wall near the booking area was a video camera, which Ms. Stanley initially believed was filming the area in which she was changing (she subsequently learned that the camera does not film that area). Officer Henson provided Ms. Stanley with a jail-issued uniform and told her to remove all her street clothing, except for her underpants, to change into the uniform. Ms. Stanley was not wearing a brassiere at that time, requiring her to expose her breasts as she changed. While Ms. Stanley disrobed (in the front portion of the room, not behind the cinder-block wall), Officer Henson remained in the room, continuously observing her until she was dressed in the jail uniform, but at no time did Officer Henson touch Ms. Stanley nor did she conduct any visual inspection of Ms. Stanley's body cavities. The entire exchange process took approximately two minutes. Ms. Stanley was then taken to a cell where she remained with several other women, but she was never introduced into the jail's general population.

Later that morning, superior officers of the Terre Haute Police Department reviewed Ms. Stanley's arrest and ordered her immediate release from custody; all criminal charges against her were eventually dropped. Ms. Stanley then was permitted to change back into the clothes in which she had arrived at the jail, but in the same room and under substantially the same procedures and conditions as when she had originally changed into the jail uniform—that is, in

the small, doorless room under the continuous observation of a female jail officer known only as "Joanie."

Ms. Stanley and her husband Laurence Stanley subsequently brought this lawsuit under 42 U.S.C. § 1983, seeking damages for being subjected to the clothing-exchange procedure, which Ms. Stanley claims violated her rights under the Fourth Amendment.[1] She contends that the jail's clothing-exchange policy subjected her to an intrusive strip search without regard to the particular charges against her (which she says were minor) or to her individual circumstances: she had no previous arrest record, an earlier pat-down search uncovered no weapons or other contraband, and jail officials had no suspicion that she was concealing any weapons or drugs. Subjecting her to a strip search on such grounds, she says, amounted to a violation of the Fourth Amendment.

After the parties submitted a joint stipulation of facts and briefed their arguments, the district court granted summary judgment in favor of the defendant officials. The court first held that while the clothing exchange procedure employed by the Vigo County jail did constitute a search, it was not a "strip search" as the district court defined that term. *Stanley v. Gentry*, No. 00-0053-C-T/H, 2002 U.S. Dist. LEXIS 14710, at *14 (S.D. Ind. Jun. 5, 2002). The court then found the search to be reasonable under the circumstances and therefore constitutional. *Id.* at *19.

---

[1] As the district court correctly noted, Laurence Stanley's claim (apparently for loss of consortium caused by the distress suffered by his wife) is entirely dependent on the success of his wife's claim.

**ANALYSIS**

We review the grant of summary judgment *de novo*, viewing all the facts in the light most favorable to the nonmoving party. *See Doe v. Heck*, 327 F.3d 492, 508 (7th Cir. 2003).

The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment's due process guarantee, protects individuals against unreasonable searches of their persons, homes, and effects. *See* U.S. CONST. amend. IV. Included within the Amendment's protection is the right to be free from unreasonable searches of one's unclothed body. *See Doe v. Calumet City, Illinois*, 754 F. Supp. 1211, 1218 (N.D. Ill. 1990) (recognizing that "deeply imbedded in our culture . . . is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their 'private' parts observed or touched by others"). While the Fourth Amendment generally requires that the issuance of a warrant, supported by probable cause, precede any search, the Supreme Court has recognized several exceptions to the warrant requirement, including so-called "stationhouse" searches of individuals arrested by the police. *See Illinois v. Lafayette*, 462 U.S. 640, 645-46 (1983); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1270 (7th Cir. 1983). As this Court has stated, however, "custodial searches incident to arrest must still be reasonable ones. . . . This type of police conduct must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.*"Id.* at 1270-71 (quotations omitted).

As an initial matter, we address the question of whether the observed clothing-exchange process at issue in this case was a "strip search." In finding that Ms. Stanley had not been subjected to a "strip search" (rather, merely a generic "search") as that term had been used by this Court, the

district court focused on the fact that she was never fully naked during the clothing exchange—the jail's policy was to require inmates to remove clothing down to their undergarments before donning the jail uniform—and that it was merely by chance that she was not wearing a brassiere at the time of her admission into the jail. In response, Ms. Stanley has brought to our attention a number of cases which define a strip search as something less than full nudity, *see, e.g., Justice v. City of Peachtree City*, 961 F.2d 188, 190 (11th Cir. 1992) (treating as a strip search the police order to "strip down to her panties," with no inspection of body cavities), as well as the statutes defining a "strip search" from 14 states—all but two of which include within their definition an inspection of a person's undergarments. *See, e.g.*, 725 ILL. COMP. STAT. 5/103-1(d) (2003) (defining "strip search" as "having an arrested person remove or arrange some or all of his or her clothing so as to permit a visual inspection of the genitals, buttocks, anus, female breasts or *undergarments* of such person" (emphasis added)).

The defendant officers contend that the clothing exchange was not a "strip search" but rather a "routine security and admission procedure at a detention facility." (Appellee's Br. at 9.) The presence of a jail officer who continuously observed Ms. Stanley as she exchanged her clothing, however, suggests that this was more than an administrative procedure for changing into a jail uniform; it implies that the officer's purpose was to watch over Ms. Stanley to ensure that nothing illicit was brought into or out of the jail. *See Johnson v. Phelan*, 69 F.3d 144, 145 (7th Cir. 1995) (noting that "[o]bservation is a form of search"); *see also Heck*, 327 F.3d at 510 ("When the Fourth Amendment was ratified, as now, to 'search' meant 'to look over or through for the purpose of finding something; to explore; to examine by inspection . . . .'" (quoting *Kyllo v. United States*, 533 U.S. 27, 33 n.1 (2001))). The observed clothing exchange thus must

be viewed as a search (for weapons or other contraband) of Ms. Stanley. Whether we further label this process a "strip search" or merely a "search" is unimportant, as the analysis remains the same.[2]

In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court identified the framework in which searches of pretrial detainees in custody are to be analyzed. In that case, the plaintiffs challenged the detention facility's policy of conducting strip searches, including visual inspection of the inmates' body cavities, following every contact visit with a person from outside of the facility. *Id.* at 558. While acknowledging that "this practice instinctively gives us the most pause," the Court held that such searches were reasonable given the circumstances, and thus did not violate the Fourth Amendment. In so holding, the Court noted that balancing the "significant and legitimate security interests of the institution against the privacy interests of the inmates" led to the conclusion that such searches were fully consistent with the Constitution, even when based on less than probable cause. *Id.* at 560. The Court then outlined a general test for reasonableness:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case, it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

---

[2]  Whether the procedure at issue here was a "strip search" or just a "search" more appropriately goes to the question of the scope or manner of the intrusion involved.

*Id.* at 559 (citations omitted). Because Ms. Stanley was a pretrial detainee subject to a search, we turn to an examination of these factors as they relate to her case.

We first consider the nature of the intrusion involved. The district court called the intrusion "narrow," describing key aspects of the clothing exchange process:

> Though Ms. Stanley was required to expose her breasts, she remained partially clothed as she kept on her underpants at all times. There is nothing to suggest that anyone other than the jail officer, of the same sex as Ms. Stanley, viewed her as she changed her clothes. So, the search was conducted in private. The time of exposure was brief, and nothing about the observation suggests that its purpose extended beyond monitoring the clothing exchange. Ms. Stanley was not required to turn around or bend for a visual inspection; nor was she required to lift her breasts to allow inspection. She was not touched during the search.

*Stanley*, 2002 U.S. Dist. LEXIS 14710, at \*15-16.

We believe the district court's characterization of the intrusion is sound. The scope of the intrusion here was not excessive: Ms. Stanley was not required to disrobe completely (she was, in fact, allowed to keep her undergarments on; the fact that she was not wearing a brassiere, thus requiring her to expose her breasts, does not by itself transform the exchange into a gross intrusion); she was allowed to undress in a semi-private setting with only one same-sex officer present to witness the exchange; and she was not required to submit to a visual inspection of any body cavities or to any touching by the jail officer. The search was apparently conducted in a professional manner—Ms. Stanley was neither manhandled nor treated rudely at any point during the clothing exchange. The search was conducted in a semi-private area—while there was no door to

the room in which Ms. Stanley was required to disrobe, there was a video camera that appeared to be observing that area, and Ms. Stanley was not allowed to disrobe behind the partial wall, there is no evidence that the setting for the clothing exchange allowed anyone other than the observing Officer Henson to witness Ms. Stanley disrobing.

The intrusion involved in this particular clothing exchange is thus distinguishable from the more intrusive searches in the cases cited in the Stanleys' briefs. For example, in *Mary Beth G.*, we held that the City of Chicago's policy of subjecting women (but not men), who had been arrested and detained, to a strip search regardless of the charges against them or whether detention officers had any reasonable suspicion that a particular woman was concealing weapons or other contraband, violated the Fourth Amendment. 723 F.2d at 1273. In that case, the detainees were "minor offenders who were not inherently dangerous and who were being detained only briefly while awaiting bond."[3] *Id.* at 1272. Despite this, the City's policy required visual inspections of the women's anal and genital cavities, a practice the Court called "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Id.* (quotation omitted). We ultimately held that such a policy violated the Fourth Amendment: "In light of the *substantial nature of the intrusions involved*, we believe these differences [from the searches upheld by the Supreme Court in *Bell v. Wolfish*] are sufficiently significant to compel our own inquiry as to whether the strip searches

---

[3] Two of the named plaintiffs in the case had been detained after being stopped for traffic violations, when police learned that they each had outstanding parking tickets. A third named plaintiff was detained for making an improper left turn and then failing to produce her driver's license. *Mary Beth G.*, 723 F.2d at 1267 n.2.

conducted by the City were 'reasonable' under the fourth amendment." *Id.* (emphasis added). In contrast to the searches conducted in *Mary Beth G.*, Ms. Stanley was subjected only to a two-minute observation by one same-sex officer while she changed clothes. She was not required to remove her undergarments (had she been wearing a brassiere, she could have left it on), subjected to any inspection of her body cavities, or touched by jail officers. *See also Stanley*, 2002 U.S. Dist. LEXIS 14710, at *9-13 (distinguishing other cases cited by Stanley).

Against this relatively minimal intrusion into the privacy interest held by Ms. Stanley, we balance the justifications for conducting the particular search challenged here. *See Mary Beth G.*, 723 F.2d at 1272 (citing *Bell*, 441 U.S. at 559). The Vigo County defendants offer two reasons for the clothing exchange policy: first, the need to prevent the introduction of weapons or contraband into the jail population, and second, the need to inventory a detainee's clothing and personal effects. We note that when considering the justifications offered by the jail, we are to give the decisions of prison officials substantial (though not complete) deference: "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547 (quotations omitted).

First, the defendant officers emphasize the need for observed clothing exchanges to "minimize risk to offenders and security personnel. This includes the confiscation of weapons and contraband that might pose a serious risk to others in a jail." (Appellee's Br. at 8.) The Vigo County Jail policy on searches notes that, "Searches may be unpleasant, but are necessary to control and locate contraband which may have entered the jail. Staff should consider every

inmate as a potential carrier of contraband." (Pl. Comp. Exhibit C at 1.)

Maintaining institutional security as well as the safety of jail officers and inmates has been recognized as a significant interest and valid justification for strip searches. The Supreme Court has observed that a "detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 559. The Court also noted that, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546. This Court has joined in these observations, concluding that "the need to assure jail security is a legitimate and substantial concern." *Mary Beth G.*, 723 F.2d at 1273. We believe that the observed clothing-exchange policy employed by the jail is a rational approach to achieving the objective of preventing the smuggling of weapons or other contraband into (or, for that matter, out of) the general jail population—a rather substantial concern given the nature of the jail system.

As for the second justification offered by the defendant officials, the practice of inventorying the clothing and other personal effects of a detainee before committing that person to the general jail population has also been held constitutional by the United States Supreme Court. *See Lafayette*, 462 U.S. at 648. The defendant officials here contend that continuous observation of a detainee as he or she changes into a jail uniform is required to ensure that a full and complete inventory is accomplished—otherwise, they argue, a detainee may simply transfer certain items from their street clothes to the jail uniform. While we agree that ensuring a complete inventory is an important goal, we believe this justification is not as significant as the first.

Effective inventories may well be accomplished without the need for continuous observation. In any event, this justification, while less persuasive than the need to preserve jail security, nonetheless adds to the case justifying the intrusion involved in an observed clothing exchange.

Finally, in balancing the relatively minimal intrusion suffered by Ms. Stanley against the justifications offered by the defendants, we agree with the district court that the search here was reasonable. Ms. Stanley disagrees with this balancing, however, arguing that while the justifications may be valid, the intrusion she suffered in this case (even if narrow), viewed in light of the circumstances of her arrest, bore no reasonable relationship to promoting those interests.[4] She contends that, as a first-time offender, arrested on a relatively minor charge, who gave neither the police nor the jail officials any reason to suspect she was concealing weapons or other contraband, the jail officials could not have had probable cause or even a reasonable suspicion that she would present some sort of danger once admitted to the jail population. Without some reason to suspect such a threat, she continues, the officers were not justified in engaging in the search. *See, e.g., Jones v. Bowman*, 694 F. Supp. 538, 545 (N.D. Ind. 1988) ("Without reasonable articulable grounds to suspect a pretrial detainee brought in on a minor charge is secreting contraband on their person, a strip search is unreasonable under the Fourth Amendment.").

This Court has noted that "[t]he more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search

---

[4] Ms. Stanley especially objects to the observed clothing exchange performed before she *left* the jail. We note that smuggling contraband *out* of a jail may present security concerns as great as those arising from smuggling contraband *into* a jail setting.

will uncover the objects for which the search is being conducted." *Mary Beth G.*, 723 F.2d at 1273. We have already noted that we find the intrusion here to be relatively minimal. Against that, we note that jail officials must view any person entering the jail system with at least a minimal amount of suspicion—especially someone just brought in on a charge of battery on a police officer (we question whether such a charge can ever be called "minor"), when officials may have little information at the time regarding the circumstances giving rise to the arrest. Given this, we believe that the relatively narrow intrusion involved in an observed clothing exchange like the one at issue in this case does not tip the scales in favor of finding such a procedure unreasonable and unconstitutional.

## CONCLUSION

The Vigo County Jail's observed clothing-exchange procedure is a reasonably and fairly designed process for promoting the legitimate goals of institutional security and accurate inventories. Our review of the particular clothing exchange conducted with respect to Ms. Stanley leads us to conclude that the relatively narrow intrusion to which she was subjected was outweighed by the jail's needs. We find that the search was reasonable and therefore did not violate Ms. Stanley's Fourth Amendment rights. Summary judgment in favor of the defendants is AFFIRMED.

A true Copy:

      Teste:

                         _____
                         *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*

USCA-02-C-0072—7-28-03